**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | |
|---|---|
| BURKART CROSSING APARTMENT PARTNERS, LLC, | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. 4:23-cv-00006-TWP-KMB |
| | ) |
| BURKART OWNER, LLC, | ) |
| | ) |
| Defendant. | ) |

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Plaintiff Burkart Crossing Apartment Partners, LLC's ("Burkart Crossing", or the "Seller") Motion for Summary Judgment (Filing No. 28). This breach of contract and declaratory judgment case stems from an agreement contemplating the purchase of an apartment complex in Seymour, Indiana, by Defendant Burkart Owner, LLC ("Defendant", or the "Purchaser"). The dispute involves Burkart Crossing's efforts to claim a Five Hundred Thousand Dollar ($500,000.00) earnest deposit tendered by the Defendant. For the following reasons, Burkart Crossing's Motion for Summary Judgment is **granted**.

## I.    BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Defendant, the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

### A.    Factual Background

#### 1.    The Agreement

On July 28, 2022, Burkart Crossing and prospective purchaser, Defendant Burkart Owner, LLC, entered into an agreement (the "Agreement") (Filing No. 29-2).    The Agreement

contemplated the sale of a two-hundred-and-ten-unit apartment complex located at 1021 Stonebridge Drive, Seymour, Indiana, commonly known as "Burkart Crossing Apartments" (the "Real Property"), along with the improvements, certain tangible personal property, and the intangible property related to the premises (together with the Real Property, the "Property"), *see id.* § 1, at 1–2. At closing, the Purchaser was to pay $38.5 million to the Seller (the "Transaction"). *Id.* § 2, at 2.

Section 3 of the Agreement required that, within two days of execution, the Purchaser was required to deposit with the escrow agent, Near North Title Group, LLC ("Escrow Agent"), an earnest deposit of $500,000.00, which "shall become nonrefundable to Purchaser except as otherwise expressly provided in this Agreement." *Id.* § 3, at 2.

Section 4 of the Agreement outlined a process in which the parties would review and dispute an issued title insurance commitment, and ultimately negotiate to determine permitted encumbrances to the title of the apartment complex prior to closing (*see* Filing No. 29-1, ¶ 12). Specifically, Burkart Crossing was to order the Escrow Agent, as issuing agent for Chicago Title Insurance Company ("Title Agent"), to issue and deliver a current commitment for a policy of title insurance (the "Title Commitment") for the Real Property in the amount of the Purchase Price, "insuring good and marketable fee simple title . . . in Purchaser" (Filing No. 29-2 § 4, at 3). The Agreement contemplated "good and marketable fee simple title" to mean, in relevant part:

> fee simple ownership . . . free of all claims, liens and encumbrances of any kind or nature whatsoever other than the Permitted Exceptions (as defined herein), and . . . insurable by Title Agent . . . at the then current standard rates under the standard form of a 2006 ALTA Owner's Policy of Title Insurance with extended coverage, with the standard printed exceptions therein deleted and including such endorsements as Purchaser shall have requested prior to the Closing Date (the "Owner's Title Policy"), without exception other than for the Permitted Exceptions. The Title Commitment and the Owner's Title Policy shall not contain any non-standard exceptions, including any exception for any mechanic's, materialsmen's or furnisher's liens or for parties in possession, except an exception for real property

taxes for the year in which Closing occurs (subject to proration in accordance with the terms of this Agreement) and such other matters as may be acceptable to Purchaser.

*Id.*  "Permitted Exceptions" meant "all matters shown on the Title Commitment that Purchaser [(Defendant)] approves, in writing, or is deemed to have approved under this Section 4."  *Id.* § 4, at 4.

Pursuant to the Agreement, after receipt of the Title Commitment, Purchaser was to give, within the fifteen (15) business days after the Effective Date[1]

written notice of all exceptions in the Title Commitment and the Survey which are not acceptable to Purchaser ("Objectionable Exceptions").  If such timely notice is not provided to Seller, then all specific matters listed in the Title Commitment and the Survey, other than Liens (as hereinafter defined) and matters Seller is required to remove hereunder, shall be considered Permitted Exceptions on the Owner's Title Policy and the Survey, as applicable.

*Id.* § 4, at 3.

After receipt of Defendant's Objectionable Exceptions, Burkart Crossing was given five (5) days

to advise Purchaser in writing which of such title defects or objections Seller does not intend to satisfy or cure; provided, however, Seller hereby agrees that Seller shall satisfy or cure any such defects or objections consisting of taxes then due and payable, mortgages, deeds of trust, mechanic's or materialmen's liens, regulatory agreements or other such monetary liens or encumbrances ("Liens").

*Id.*  In the event Burkart Crossing

fails to give such written advice to Purchaser within five (5) days of receipt of a written notice regarding the Objectionable Exceptions, Seller shall be deemed to have elected not to satisfy or cure any such defects or objections set forth in Purchaser's notice other than Liens (which Seller  shall satisfy and which shall in no event constitute Permitted Exceptions) . . . .

*Id.*  The Agreement permitted Defendant to then either:

---

[1] The Agreement contemplated the Effective Date as July 28, 2022, or the date it was "executed by both [Burkart Crossing and Burkart Owner]" (Filing No. 29-2 § 26, at 17; *see id.* at 19).

- terminate the Agreement by written notice to Burkart Crossing "on or before the fifth [] business day following (i) Purchaser's receipt of Seller's response to [the] title objections or, (ii) if Seller fails to respond to Purchaser's title objections, the last day of Seller's five (5) day response period" — in which case Defendant would receive a refund of the Earnest Deposit, *id.* § 4, at 4; or,

- accept title subject to such specific non-monetary encumbrances (other than Liens), whereupon such additional non-monetary encumbrances "shall become Permitted Exceptions." *Id.*

If Defendant failed to make such election within such period, it was to "be deemed to have elected to accept the Property subject to the applicable non-monetary encumbrances", unless certain circumstances applied. *Id.*

The Agreement further explained that Burkart Crossing was to "have until the Closing Date to satisfy or cure all such defects and objections which [it] agreed (or is obligated) to satisfy or cure as provided above, as well any defect or objection arising after [the] title objections are delivered to [it]." *Id.* "In the event Seller fails or refuses to cure any defects and objections which are required herein to be satisfied or cured by Seller prior to the Closing Date," then, at its option, Defendant could either:

- terminate the Agreement by written notice to Burkart Crossing, in which event the Agreement would have no further force and effect, the Earnest Deposit shall be immediately returned to Defendant and the parties would "have no further rights, obligations or liabilities hereunder, except as expressly set forth herein to the contrary", *id.*; or,

- accept title to the Property subject to such defects and objection. *Id.*

The third and last paragraph of Section 4 also indicated:

Purchaser's obligation to consummate the purchase of the Property on the Closing Date shall be subject to the Title Agent being committed to issue the Owner's Title Policy in the form as required pursuant to this Section 4.  If such condition has not been satisfied or waived in writing by Purchaser on or as of the Closing Date, then Purchaser shall have the right, at Purchaser option, to terminate this Agreement by giving written notice to Seller, in which event all rights and obligations of the parties under this Agreement shall expire and Escrow Agent shall promptly deliver the Earnest Deposit to Purchaser.

4

*Id.*

Pursuant to Section 6 of the Agreement, conveyance of the Property "shall be consummated with settlement and title services to be performed . . . (the "Closing")[] on the date that is sixty (60) days after the Effective Date . . . , or such earlier time as Purchaser shall designate (the "Closing Date")." *Id.* § 6, at 7. Section 6 further provided Defendant, as the purchaser, with a two-time right to adjourn the scheduled Closing Date each for a period not to exceed thirty (30) days ([Filing No. 29-1](#), ¶ 23; *see* [Filing No. 29-2](#) § 6, at 7).

Section 13 of the Agreement addressed Burkart Crossing's remedies upon breach by Defendant and provided as follows:

> If the purchase and sale of the Property is not consummated in accordance with the terms and provisions of this Agreement due to a default by Purchaser under this Agreement and such default is not cured by Purchaser within ten (10) days after written notice of such breach or default from Seller, then as Seller's sole and exclusive remedy, the Earnest Deposit shall be delivered to Seller as full liquidated damages for such default.

([Filing No. 29-2](#) § 13, at 13–14). Notwithstanding this provision, the prevailing party in any enforcement action was further entitled to recover reasonable attorney's fees under the Agreement. *See id.* § 13, at 14, § 21, at 17.

### 2.    <u>Actions Pursuant to the Agreement and the Parties' Alleged Breaches</u>

In accordance with the Agreement, Defendant timely delivered the earnest deposit to the Escrow Agent ([Filing No. 29-1](#), ¶ 9). According to Defendant, Burkart Crossing demanded it to "go 'hard' with its deposit on Day 1" even though there was no due diligence period and that it "was not afforded any opportunity to investigate the Property or the veracity of Seller's representa[tion]s and warranties" in the Agreement ([Filing No. 39-1](#), ¶ 4).

Consistent with its obligation, the Escrow Agent in turn delivered to Defendant "a preliminary Title Policy that contained no fewer than twenty-one (21) exceptions to title." *Id.* ¶ 8.

Defendant was primarily concerned with Exceptions 11, 12, 14, and 16 which "posed clouds to title" and "precluded conveyance of good and marketable fee simple title." *Id.* ¶ 9.  They further "prevented issuance of the requisite Owner's Title Policy without exception", *id.* ¶ 10, and "rendered certain of Seller's representation[s] and warranties – on which we relied when entering into the PSA – untrue." *Id.* ¶ 11.  Specifically, Schedule B, Part II of the Commitment for Title Insurance indicated that the policy would include the following exceptions, "unless cleared to the satisfaction of the Company [(Chicago Title Insurance Company as the Title Agent)]":

> 11. Easement, restrictions, possible assessments for maintenance and rights of others entitled to the continued uninterrupted flow of water through the Zimmerman Legal Drain, in accordance with Indiana Drain Code, IC (1981) 36-9-27-33 et seq, and as referenced on survey dated October 17, 2019 by Michael L. DeBoy, Indiana Registered Land Surveyor, DeBoy Land Development Services Project No. 2013-0026/2018-0062/2019-0079, hereafter referred to as "the Survey."
>
> 12. Easement for communication system and incidental purposes in favor of Comcast of Indiana/Kentucky/Utah recorded October 31, 2014, as Instrument 201406622. (Exact location cannot be determined from the record.)
>
> ….
>
> 14. Easement for access for drainage inspection and maintenance and incidental purposes in favor of City of Seymour, by its Board of Public Works & Safety, recorded January 28, 2016, as Instrument 201600720, and as referenced on "the Survey".
>
> ….
>
> 16. ALTA/NSPS Survey dated October 17, 2019 by Michael L. DeBoy, Indiana Registered Land Surveyor, DeBoy Land Development Services Project No. 2013-0026/2018-0062/2019-0079, referred to as "the Survey", discloses the following:
>
> > a. Sidewalk located across portions of the southerly and westerly sides of the Land.

(Filing No. 29-3 at 9, 10.)

By letter dated August 18, 2022 ("Objection Letter"), Defendant listed the exceptions that

it contended "must be satisfied, resolved or corrected, as appropriate." (Filing No. 29-4 at 1.)  In

its objections to Exceptions 11, 12, 14, and 16, Defendant indicated:

> Exception No. 11: Purchaser objects to this exception.  Seller must provide
> additional information regarding any "restrictions and possible assessments for
> maintenance" relating to the Zimmerman Legal Drain and who is responsible for
> its maintenance.
>
> Exception No. 12: Purchaser objects to this Exception unless Seller provides
> additional information on whether there is an underlying agreement with Comcast
> (if so, please provide), if the broadband services are still being provided to the
> Property,[2] and if there are any related door fees.
> ….
>
> Exception No. 14: Purchaser objects to this Exception unless Seller obtains an
> estoppel certificate from the City of Seymour in form and substance reasonably
> acceptable to Purchaser that covers any outstanding obligations under the easement
> agreement.  Seller must also provide all maintenance records relating to the
> Drainage Facilities.  Further, upon the survey being reviewed and read into the
> policy, Title Company shall either omit this Exception if it is not relevant and/or
> add the following to the end of such Exception: "as expressly shown on Survey".
>
> Exception No. 16: Purchaser requests Title Company provide affirmative coverage
> over these encroachments listed in Exception 16(a).  Further, upon the survey being
> reviewed and read into the policy, Title Company shall either omit this Exception
> if it is not relevant and/or add the following to the end of such Exception: "as
> expressly shown on Survey".

*Id.* at 3.

The parties' dispute centers on Burkart Crossing's response to these objections.

Undisputedly, Burkart Crossing sent a timely letter via email on August 23, 2022, in which it

indicated:

> Exception No. 11: Seller has no additional information on this matter.  Indiana Code
> 36-9-27-33 details the rights of entry related to this regulated drain.
> Exception No. 12: Seller has previously provided a copy of the requested agreement
> with Comcast and notes that per the terms of the Agreement, Seller is required to
> terminate all Service Contracts. Seller requests that Purchaser provide Seller with

---

[2] Here, Burkart Owner defines "Property" as the "real property . . . commonly known as Burkart Crossing Apartments" (Filing No. 29-4 at 1).

a firm commitment of no less than sixty (60) days' notice of its anticipated closing date or notice of termination will be delivered at closing and the agreement with Comcast will terminate 60-days post-closing.

….

Exception No. 14: Seller will request an estoppel certificate from the City of Seymour in form and substance reasonably acceptable to Purchaser that covers any outstanding obligations under the easement agreement. Seller agrees to provide all maintenance records relating to the Drainage Facilities that are in its actual possession, if any.

Exception No. 16: No response from Seller required as this is a matter for the Title Company.

(Filing No. 29-5 at 3.)

Defendant considered  the written notice insufficient under the terms of the Agreement, because Burkart Crossing "failed to commit to addressing or rectifying Exceptions 11, 12, 14 and 16", and never addressed or rectified them (Filing No. 39-1,  ¶¶  13, 14).  Accordingly, the Escrow Agent never amended its Title Commitment to reflect good and marketable fee simple title or to show willingness to issue a title policy without exceptions.  *Id.* ¶¶  15, 16.  Burkart Crossing "neither delivered to Purchaser the executed estoppel certificate from the City of Seymour nor the termination of the Comcast Agreement that Seller agreed to deliver" in the written notice (Filing No. 39-2, ¶ 12).  Notwithstanding this, Burkart Crossing demanded that Defendant "close and purchase the Property — over the Title Exceptions, without good and marketable fee simple title, and in the absence of an Owner's Title Policy without exceptions."  (Filing No. 39-1, ¶ 18.)

Burkart Crossing disputes this retelling.  By its account, the notice was sufficient and it was instead Defendant who subsequently breached the Agreement by not providing written notice of an election to terminate the Agreement within the time limits set forth in Section 4, nor closing by the Closing Date, which was originally to occur "on or before September 26, 2022" (Filing No. 29-1, ¶ 11; *see id.* ¶¶ 11, 21).

The following interactions are undisputed.  On October 27, 2022, counsel for Burkart Crossing sent Defendant a Notice of Default by email (Filing No. 29-6) asserting that Defendant had defaulted under the Agreement due to failures to properly exercise the first adjournment option (providing written notice and depositing additional earnest money) and close the Transaction on or before the Closing Date (*see also* Filing No. 29-1, ¶ 26).  Burkart Crossing asserted that Defendant could exercise the second adjournment option by providing written notice of the same and delivering $100,000.00 – the combined amount required to exercise the first and second options.  *Id.* ¶ 27.

Ten days passed with Defendant neither responding to Burkart Crossing, nor curing the default, nor exercising its adjournment options.  *See id.* ¶ 28, 29.  According to Burkart Crossing, "[d]espite [Defendant's] inaction and silence, [Burkart Crossing] stood ready, willing, and able to close the Transaction in early November 2022 and continued to move forward to Closing."  *Id.* ¶ 30.

When the November 7, 2022 deadline passed, Burkart Crossing requested release of the earnest deposit (*see* Filing No. 29-7), and a series of email exchanges ensued (Filing No. 29-8).  On November 8, 2022, counsel for Defendant disputed that delivery of the earnest money to Burkart Crossing "would be contrary to the contract."  *Id.* at 7.  The next day, counsel for Burkart Crossing inquired whether the purchaser was "prepared to close", suggested that the parties "set the date [and] go from there", and proposed "this Friday" (November 11, 2022).  *Id.*

On November 14, 2022, the Escrow Agent indicated that the parties "either need a mutual release signed by [Defendant] indicating that we can release it or we schedule a closing."  *Id.* at 5. The next day, Defendant indicated it had "serious concerns with the nonperformance by Seller of

its material obligations under the [Agreement]" and had "multiple bases" on which to believe it was not obligated to close.  *Id.* at 4.

On November 18, 2022, Burkart Crossing responded it was "continuing to move forward to close" and asked the Escrow Agent to "re-convene closing for next Tuesday" (November 22, 2022), given it had received "no feedback from [Purchaser] on any of the draft closing documents . . . ."  *Id.* at 3 (emphasis omitted).  Defendant responded the same day that it would not agree to schedule closing until its concerns were resolved.  *Id.* at 1.

In January 2023, after the lawsuit had been initiated, Defendant contacted the Seller about the possibility of renegotiating the purchase price for the Property (Filing No. 29-1, ¶ 40).

**B.   Procedural Background**

On December 6, 2022, Burkart Crossing sued Defendant in Jackson County Superior Court (Filing No. 1-1 at 3–8), alleging full performance under the Agreement on its part, but breach by Defendant in failing to consummate the purchase and sale of the Property (Filing No. 1-1, ¶¶ 24, 25, at 6).  In addition to bringing the breach of contract claim, Burkart Crossing sought a declaratory judgment that it was entitled to the earnest deposit.  *See id.*

Defendant removed the action to the district court on January 13, 2023, based on diversity jurisdiction (Filing No. 1).  Defendant did not raise any counterclaims in its answer but did include seven express affirmative defenses (*see* Filing No. 8 at 6–7).  In relevant part, Defendant asserts that Burkart Crossing "first breached the [Agreement] and therefore is barred from any recovery under the First Breach Doctrine", it "failed to satisfy one or more conditions precedent", and its "inducements and misrepresentations in the contract and during the contract period" barred the claims.  *Id.* at 7.

Burkart Crossing now moves for summary judgment on its claims for breach of contract and declaratory judgment.  (Filing No. 28.)

## II.    SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted).  Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).  "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"The interpretation of an unambiguous contract is a question of law, and therefore a dispute over the terms of an unambiguous contract is suited to disposition on summary judgment." *Utility Audit, Inc. v. Horace Mann Service Corp.*, 383 F.3d 683, 687 (7th Cir. 2004) (affirming summary judgment in a breach of contract suit).  Under Indiana law, which governs the Agreement (*see* Filing No. 29-2, ¶ 19), courts construing an agreement "focus on the words that the parties agreed to, giving clear and unambiguous language its ordinary meaning." *Hartman v. BigInch*

*Fabricators & Constr. Holding Co., Inc.*, 161 N.E.3d 1218, 1220 (Ind. 2021) (citing *Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574, 577 (Ind. 2013)).

## III.   DISCUSSION

The parties allege that the other is liable for breaching the Agreement.  "The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages."  *Berg v. Berg*, 170 N.E.3d 224, 231 (Ind. 2021) (internal citation and quotation marks omitted).  In Indiana, when considering a breach of contract claim,

> …the Court's primary objective is to effectuate the intent of the parties at the time the contract was made, which is determined by examining the language the parties used to express their rights and duties.  The Court must read the contract as a whole, construing language to give meaning to all of the contract's words, terms, and phrases.  Likewise, the Court must accept a contract interpretation that harmonizes provisions, not one that places provisions in conflict.

*Nikish Software Corp. v. Manatron, Inc.*, 801 F. Supp. 2d 791, 800 (S.D. Ind. 2011) (citations omitted).

Burkart Crossing seeks judgment as a matter of law because the terms of the Agreement are clear and unambiguous and that the uncontroverted facts establish that Defendant committed a material breach when it neither terminated the Agreement within the allotted period, nor proceeded to Closing (*see* Filing No. 30 at 11).

Instead of filing a cross-motion for summary judgment motion, Defendant maintains material facts remain disputed.  Defendant contends that Burkart Crossing was the party to commit the first material breach and Defendant did not breach the Agreement, rather the Seller's "misrepresentations, title encumbrances[,] and the qualified title policy entitle" recovery in its favor (Filing No. 39 at 2).

## A.   Burkart Crossing's August 23, 2022 Response Invoked 5-Day Termination Period

According to Burkart Crossing, Defendant failed to take the recourse available to it under the Agreement concerning the exceptions to the Title Commitment.

> Specifically, [the Purchaser] had two (and only two) options: (1) terminate the Agreement by providing written notice . . . within five days of receiving [Burkart Crossing's] Response Letter; or (2) proceed to Closing, in which case [the Purchaser] would accept the Property subject to the three exceptions,[3] which would become 'Permitted Exceptions.'

(Filing No. 30 at 15).  Since it is undisputed that Defendant did neither — nor did it extend the Closing Date by exercising certain adjournment options — it follows that Defendant committed an uncured material breach of the Agreement in not closing, thereby triggering Section 13's provision of remedies for Burkart Crossing.

Defendant responds by targeting Burkart Crossing's August 23, 2022 letter.  Defendant asserts that it "acknowledged the Title Exceptions and the fact that their presence constituted a breach of the [Agreement]," but which "neither offered a resolution nor a commitment to curing the Exceptions or removing them as clouds to title."  (Filing No. 39 at 7 (citing in part Filing No. 39-1, ¶ 14 (Burkart Crossing "never addressed or rectified" the exceptions); Filing No. 39-2, ¶ 10 (Burkart Crossing's response "did not cure" the exceptions)).)

The Court reads the Agreement to express an intent of the parties that, once objections to certain title exceptions were raised, those exceptions must be addressed in one of three ways. 'Unacceptable' objectionable exceptions would (1) be cured by Burkart Crossing (the default option), (2) become 'acceptable' to Defendant (*i.e.*, they became "Permitted Exceptions" by operation of the Agreement, *see* Filing No. 29-2, § 4, at 4), or (3) persist as 'unacceptable' despite Burkart Crossing's agreement to cure, in which case the Agreement afforded Defendant the

---

[3] Burkart Crossing later addresses in its briefing all four title exceptions, including Exception 16.  *E.g.*, Filing No. 40 at 39–40.

opportunity to terminate the Agreement.  In reaching this conclusion, the Court reads, as it must, every sentence of the middle paragraph of Section 4 harmoniously with the others.

If Burkart Crossing did not "intend to" cure any unacceptable objectionable exceptions that were raised (*i.e.*, the company proactively decided against curing), *id.* § 4 at 3, the Agreement contemplates two scenarios.  Either Burkart Crossing would (1) notify Defendant in writing of the defects or objections it did not intend to satisfy or cure, *see id.* at 3, § 4, or (2) *not* notify Defendant of such intentions.  The Agreement explicitly buttresses against the second scenario, given it

> fail[ed] to give such written advice . . . within five (5) days of receipt of a written notice regarding the Objectionable Exceptions, [Burkart Crossing] shall be deemed to have elected not to satisfy or cure any such defects or objections set forth . . . other than Liens (which [Burkart Crossing] shall satisfy and which shall in no event constitute Permitted Exceptions) . . . .

*Id.*

Alternatively, the first scenario, next mentioned in the middle of the very same, nearly two-hundred-word sentence, *see id.* at 4, § 4 (". . . Purchaser's receipt of Seller's response to Purchaser's title objections . . . ."), then places the baton back in Defendant's hands.  Upon receipt of the response, Defendant must then decide between either terminating the Agreement within a five-day period, or "accept title subject to such specific applicable non-monetary encumbrances", unless certain circumstances, not present here, were to occur.  *Id.*

It is ultimately unclear to the Court what Defendant specifically argues as it claims that the written notice, in not offering a resolution nor a commitment to cure, "was a breach" of the Agreement.  *See* Filing No. 39 at 7 ("*This* was a breach of the PSA!" (emphasis added)).  To the extent that Defendant argues that the notice provided in the August 23, 2022 letter inadequately advised as to which title defects or objections Burkart Crossing did not intend to satisfy or cure, the Court does not agree.  Instead, it finds that Burkart Crossing's response initiated a five-day

reply period in which Defendant could either terminate or accept title (with the remaining encumbrances being deemed "Permitted Exceptions").

Burkart Crossing addressed each of Defendant's four objections, complying with and explicitly mentioning the majority of the purchaser's requests. Specifically, Burkart Crossing responded as follows:

- **Objection to Exception No. 11**: Burkart Crossing indicated it had no additional information to provide.

- **Objection to Exception No. 12**: Defendant objected "unless" Burkart Crossing provided additional information on an agreement with Comcast (Filing No. 29-4 at 3), which Burkart Crossing indicated it supplied (*see* Filing No. 29-5 at 3). Burkart Crossing additionally indicated it would adhere to the Agreement's requirement to terminate all service contracts, presumably including the requested Comcast agreement, with a sixty-day notice. *See id.*

- **Objection to Exceptions No. 14 and 16**: Defendant objected to Exception No. 14 "unless" Burkart Crossing obtained an estoppel certificate from the City of Seymour that covered any outstanding obligations under the easement agreement. It further required all maintenance records relating to the drainage facilities mentioned in the exception. Burkart Crossing agreed to request an estoppel certificate and provide all maintenance records in its possession, if any.

Defendant separately expressed that the Title Company provide affirmative coverage to the encroachment listed in Exception No. 16(a), and omit and/or amend Exception Nos. 14 and 16. Burkart Crossing responded that "[n]o response" was required for the objections to Exception No. 16 since it was "a matter for the Title Company". *Id.* at 3. Since Defendant included the same

"omit and/or add" language in both title exceptions, the Court understands Burkart Crossing's omission of the "matter for the Title Company" response to be intentional.

The Agreement is silent on how to evaluate or judge Burkart Crossing's performance of the duty to "advise" Defendant of which such title defects or objections it did not intend to satisfy or cure; it merely directs that the advice shall be "in writing" (Filing No. 29-2 § 4, at 3).  Overall, however, the Court finds that Seller's responses, as described above, were sufficient to serve as notice of the objectionable exceptions it intended to satisfy and cure, as well as those for which it *did not intend* to so satisfy or cure.  Thus, a five-day reply period began for Defendant to either terminate the Agreement or "accept title subject to such specific non-monetary encumbrances (other than Liens)," *id.* § 4, at 4, which became Permitted Exceptions by operation of the Agreement when Purchaser refused to make such election within the period.

Even if the Court were to find Burkart Crossing's response insufficient — *i.e.*, to the extent the statements therein could be considered ambiguous or non-responsive to the objections, etc. — a five-day reply period would be triggered nevertheless, just in a manner untethered to when the response was received.  Specifically, Section 4 of the Agreement contemplates that the burden would still transfer to Defendant to decide to either terminate within "the last day of [Burkart Crossing's] five (5) day response period" or accept title subject to the newly deemed Permitted Exceptions.  *Id.*

**B.**   **Defendant Materially Breached the Agreement by Neither Terminating the Agreement nor Accepting Title to the Property Subject to Permitted Exceptions**

Armed with Burkart Crossings' notice, Defendant sat on its hands.  The designated evidence shows the Defendant never sought to exercise either option provided in the Agreement and never replied to the August 23, 2022 response.  Had Defendant corresponded further about the unacceptable title exceptions or sought clarification about the response, and opposed summary

judgment by designating evidence of such communications, then it would have at least created a factual dispute as to whether it, as the purchaser, wished to reach a negotiated compromise concerning the exceptions it continued to deem unacceptable. Were such a factual dispute to exist, the Court might have, in turn, inferred that it was Burkart Crossing that was unwilling to close by curing, or clarifying its positions on, the exceptions — a triable issue that would survive summary judgment.

Instead, the undisputed record conveys that Defendant skirted its contractual obligation to terminate or accept title well beyond the end of the five-day period on August 30, 2022, and the Closing Date on September 26, 2022. The designated evidence shows that Defendant went silent, neither terminating nor accepting, through the beginning of November of that year, when it finally disputed the Seller's request for the earnest money. The November 8, 2022 message disputing Burkart Crossing's entitlement to the earnest money is vague and leaves unexplained the reasons that such an award "would be contrary to" the Agreement (Filing No. 29-8 at 7). Even assuming Defendant protested the unacceptable title exceptions that were still uncured in November 2022, this exchange occurred seventy (70) days after the close of the five-day window and forty-three (43) days after the Closing Date (*see* Filing No. 29-2 § 6, at 7, § 26, at 17).

As explained earlier, since Defendant did not elect to terminate the Agreement by the end of the five-day period(s) described above, it was deemed to have elected to accept the Property subject to the applicable non-monetary encumbrances. *Id.* § 4, at 4. By failing to consummate the Transaction, the Defendant defaulted by October 27, 2022, at the very latest. Furthermore, no evidence demonstrates that Defendant properly exercised either of its adjournment options. Instead, the designated evidence suggests that, to the extent Defendant did exercise the first adjournment option, it never deposited additional earnest money or provided the necessary notice

(*see* Filing No. 29-6).  As required, Burkart Crossing provided its counterpart notice of the default, which Defendant did not cure within ten days.

Under these circumstances, the Court finds that Defendant materially breached the Agreement.  The Defendant's arguments to the Court now are likewise unavailing.  To the extent Defendant did not wish to accept title subject to the Permitted Exceptions, it could have exercised its option to terminate the Agreement within the parameters provided in the contract.  Defendant's contention that "[a]s the closing date approached, the exceptions listed above — among others — remained uncured, obstructing conveyance . . . of good and marketable fee simple title" misses the mark.  Even if Defendant perceived at some point prior to the Closing Date that the seller had not cured certain defects and objections which it had agreed to or was obligated to satisfy or cure (*see, e.g.*, Filing No. 39-2 at 3 ("to [his] knowledge, [Burkart Crossing] neither delivered to Purchaser the executed estoppel certificate from the City of Seymour nor the termination of the Comcast Agreement that Seller agreed to deliver"), then the Agreement clearly contemplated that the purchaser had the option to "terminate . . . by written notice" or "accept title to the Property subject to such defects and objection."  (Filing No. 29-2 § 4, at 4.)

The Court reads the provisions governing Seller's "fail[ure] or refus[al] to cure any defects and objections" appearing in the latter half of Section 4's second paragraph, *id.*, in harmony with, and considering the rights and duties expressed in the remainder of the same section.  The Court is not persuaded that the parties contemplated the purchaser to have an unfettered right to delay Closing *indefinitely*; as such, it is inconsequential that the easements in Exception Nos. 12 and 14 continued to encumber the title since Defendant was able to (but did not) terminate the Agreement.

**C.    Defendant's Breach Is Not Excused and No Genuine Issues of Material Fact Preclude Summary Judgment**

**1.    Burkart Crossing's Representations and Warranties**

Without fully fleshing out its argument, Defendant contends that the existence of the Title Exceptions constituted "violations of the Section 5(a) representations and warranties in that (1) Seller was not fully seized and possessed of the premises subject to the rights of tenants as tenants only; (2) Seller did not own the Property free and clear or all encumbrances, rights of others, or liens." (Filing No. 39 at 6.)

Upon close review of Section 5, the Court does not agree with Defendant's assessment of the inducements or representations made under the Agreement.   As pointed out, Section 5 contemplates that Burkart Crossing made certain warranties and representations to induce its counterpart into the Agreement, all of which were to "be true and correct in all material respects as of the date of Closing" (Filing No. 29-2 § 5(a), at 4).  Such representations included, however, that Burkart Crossing (a) was "fully seized and possessed[4] of the Premises subject to the rights of tenants as tenants only without any right or option to purchase or ground lease all or any portion of the Premises," and (b) "own[ed] legal and beneficial title to the Personal Property and the Intangible Property free and clear of all Liens except for Seller's mortgage financing (which Seller shall pay off and release at or before the Closing)".  *Id.* § 5(a), at 5.

Defendant has not presented any evidence that disputes Burkart Crossing was not fully seized and possessed of the premises during the relevant period.  To the extent Defendant argues that the Title Policy Exceptions demonstrate possession of the Property in a manner inconsistent with the warranty, the Court does not agree.  Title encumbrances do not negate Burkart Crossing's representation; in context, the Seller's guaranteeing phrase "fully seized and possessed" only ensured possession unhindered by the rights or options of apartment tenants to purchase or ground lease all or any portion of the premises.

---

[4] "Seize" means "[t]o be in possession (of property)", while "possess" means "[t]o have in one's actual control; to have possession of."  BLACK'S LAW DICTIONARY (12th ed. 2024).

Moreover, the Title Policy Exceptions at issue demonstrate at best that Burkart Crossing lacked legal and beneficial title free and clear of all liens to *some* property involved in the transaction, but not necessarily the " Personal Property and the Intangible Property" for which Burkart Crossing made representations and warranties.  The Agreement defines each of the terms "Personal Property" and "Intangible Property" as separate from "Real Property", *see id.* § 1(c), at 1, § 1(g), at 2, even though the collective term "Property" encompasses all three.  *See id.* § 1(i), at 2.  Since the Exceptions in question indisputably relate to real property easements, they are immaterial to the warranties and guarantees made by the seller.  Additionally, Defendant designates no evidence that the Seller *knowingly* made false material representations aimed at inducing the other party to purchase the Property.

### 2.   Owner's Title Policy Without Exception

Lastly, Defendant argues the "fact that Near North Title Group deemed Exceptions 11, 12, 14 and 16 as clouds to title and an impediment to the issuance of an Owner's Title Policy without exceptions, gives Purchaser the absolute right to suspend closing and/or terminate the PSA and recover its Earnest Deposit – case closed!"  ([Filing No. 39 at 8](#) (emphasis omitted).)

In asserting as much, Defendant relies heavily on the last paragraph of Section 4, which makes clear that the obligation to consummate the purchase of the Property on the Closing Date is "subject to the Title Agent being committed to issue the Owner's Title Policy *in the form as required pursuant to this Section 4*."  ([Filing No. 29-2](#) § 4, at 4 (emphasis added).)

Quite unlike Defendant's preferred interpretation, though, the first paragraph in Section 4 only requires a title commitment insuring "good and marketable fee simple title" — which is defined two sentences later to mean "fee simple ownership . . . free of all claims, liens and encumbrances of any kind or nature whatsoever *other than the Permitted Exceptions . . . .*"  *Id.* §

4, at 3 (emphasis added).   In turn, "Permitted Exceptions" is defined in part as "all matters shown on the Title Commitment that [Defendant] . . . is deemed to have approved".  *Id.* § 4, at 4.

In light of the Agreement's plain language defining the required form for the title policy, taken in conjunction with the encumbrances-turned-Permitted Exceptions as outlined above, *see supra* Section III.A., the Court finds that Defendant has raised no genuine issue of material fact precluding summary judgment.  This conclusion is both irrespective of whether "Near North Title Group never amended its Title Commitment to show its willingness to issue an Owner's Title Policy without exceptions" (Filing No. 39-1,  ¶ 16), and notwithstanding what limited discovery from Near North Title Group (*i.e.*, title file and deposition testimony) might have revealed (*see* Filing No. 35).  For reasons similar to those expressed previously, *see supra* Section III.B., the Court furthermore does not find the Agreement to provide Purchaser with an "absolute right to suspend closing" (Filing No. 39 at 8) beyond the limited right outlined in Section 4.

In sum, the Court ultimately finds Defendant's breach remains unexcused.  Neither the argument about Section 5(a) representations, nor the argument about title policy commitment, convince the Court that the Purchaser's breach in unduly holding the Transaction hostage was justified under the Agreement's clear provisions.

## IV.   CONCLUSION

Burkart Crossing, as the moving party, has affirmatively designated evidence that shows no genuine issues of material fact preclude summary judgment in its favor.  For the reasons expressed above, Burkart Crossing's Motion for Summary Judgment (Filing No. 28) is **GRANTED** in its entirety.  Defendant, Burkart Owner LLC., was and is currently in default under the Agreement, therefore Burkart Crossing is entitled to the $500,000.00 Earnest Deposit **plus reasonable attorney's fees** for Count 1.

Final judgment will issue in a separate order.

21

**SO ORDERED**.

Date:  9/3/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

William J. Barkimer
KRIEG DEVAULT LLP
wbarkimer@kdlegal.com

S. Joshua Kahane
GLANKLER BROWN PLLC
jkahane@glankler.com

Yosef Horowitz
GLANKLER BROWN, PLLC
jhorowitz@glankler.com